Good morning, your honors. May it please the court, my name is Geoffrey Popovich on behalf of Nicholas Karanja. We're here to challenge the agency's denial of my client's asylum, withholding of removal, and Convention Against Torture application on the basis of the immigration judge's finding that his testimony was not credible. We would submit that the immigration judge's credibility determination was based on impermissible conjecture about the way in which homosexual individuals lead their lives and that the board affirmed that finding and in its own right committed impermissible fact finding about the characteristics of a letter Mr. Karanja had submitted. When the immigration judge heard this claim, he said Mr. Karanja's testimony was incredible for roughly three reasons. Because Mr. Karanja was claiming to be gay but had admitted to having relations with women twice before. That the immigration judge didn't believe that police officers in Kenya would follow gay men around in the particular way that he said that they had. And also that he was never tried for breaking the law in Kenya in the various times he was arrested. The board only affirmed one of those findings, likely because the other two don't make sense. The record shows that the police do follow gay men around in exactly the same way Mr. Karanja testified. And also it shows that gay men typically are not tried for breaking the law. The sole factual finding before the court then is whether an individual who identifies as homosexual is incredible because in the past he has had heterosexual relationships. Is that the only basis for finding that he was contradictory as to his sexual claims? It's the only basis the board affirmed. Now the immigration judge gave those three but the board certainly did not affirm the finding that he was incredible because of his testimony about what happened in Kenya. It just wasn't plausible. The board found that he testified that he was not bisexual, correct? That's true. And there was evidence in the record from Mrs. Royston, his sometimes wife of three years, that he had raped her time and again and had snuck into her room to touch her. Is that consistent with being a homosexual? I would submit that the Royston letter is another element of this case that's highly challengeable. First, the Royston letter. Can you answer my question? Yes. If the Royston letter were true, it would be inconsistent with a person who's homosexual. Why isn't the Royston letter in evidence and true for our purposes? Well, first, Mr. Karanja was not given an opportunity to object to the admission of the letter. Mrs. Royston wasn't present. And remember, another letter was in the record, this Henry Greathouse letter, and the judge said I'm giving it no weight because Greathouse isn't here to testify. And yet Royston's letter is the basis of a credibility determination. Was there an objection before the immigration judge to the submission or proffer of evidence of the Royston letter? The Royston letter was not a letter. It was a report to the police for domestic violence purposes, correct? It was a letter which had attached to it a request for a protection order. That's correct. Was there an objection lodged by Mr. Karanja's counsel before the IJ on grounds of hearsay or other inauthenticity of foundation? There wasn't an objection, but counsel was permitted to withdraw based on her own admission that she had been badly representing Mr. Karanja. So your answer is that there wasn't an objection, so therefore it's in the record. What you're arguing now is what is the weight of the evidence. That's true. All right. But we would ask the Court to keep in mind the Henry Greathouse letter. And if the immigration judge can dismiss one and not the other, it's a serious problem. The other issue with the Royston letter is that Mr. Karanja submitted a separate letter saying Ms. Royston has been defrauding Section 8 for housing, and the only reason she submitted this letter and submitted those claims to the police was to get back at me. That letter was not placed into the record. The immigration judge did not mark it as an exhibit. And so the record before the Court is incomplete. The immigration judge essentially picked which parts he wanted to have part of the record, which letters he would give credit to and which wouldn't. And at the end of the day, So is your position that the immigration judge, in his evidentiary rulings, in admitting the Royston letter and not admitting the other two letters that you indicated, deprived Mr. Karanja of due process? That's essentially the claim. Is that argued in your briefs? We've argued that failure to admit the objection to the Royston letter, the Section 8 letter, was probably harmless because the immigration judge did not base his credibility determination on the Royston letter. His credibility determination was based on one thing. Well, three things, but only one of which the Board affirmed, that having relationships with women was inconsistent with being gay. Counsel, I'm concerned about a different inconsistency in the record. And I don't read the record, by the way, or the decision quite as narrowly. So maybe we need to talk about that as well. But isn't there a larger inconsistency between the notion that a person would claim to be a homosexual living in Kenya and be persecuted there, harassed there at best, and then when he has a chance to come to this country and live a much more openly gay lifestyle? He didn't do that. He couldn't show that he did that. Well, he did testify that he led a gay lifestyle, that he had relationships here. He submitted the Gray House letter that said he attended gay pride parades. He did testify he had these relationships. Attending a gay pride parade doesn't strike me as terribly weighty evidence. A lot of people do that. Straight and gay people do that. I certainly have, and I'm not gay. But I would submit that he had these relationships with women, and he testified that his brother was President of the United States. He was concerned that if his brother knew he was gay, he would report it to his father, and that his father had threatened to disown him if he didn't quit the shenanigans, as he referred to it, which was a reference to his past activity as a homosexual man in Kenya. That was the other problem I had with that, because it seemed to me to be a bit of reading between the lines on my part, but that reference to his dad telling him he needed to quit the shenanigans indicated to me that his father was aware that he was gay. His father was aware that he was gay. And, in fact, when he was sexually assaulted by the police, his father took him to the hospital, but he testified his father did not tell the hospital that he had been assaulted because he was gay because his father was embarrassed. And so it's true that his father knew, but I don't think his father knew he was still living a gay lifestyle in the United States, and that was his justification for having to keep up appearances and have relationships with these two women. Can I ask my other question just quickly? Sure. The BIA referred to inconsistencies and then seemed to me to refer back to Pages 4 and 6 of the IJ's report. Sure. So there are several different inconsistencies there on Pages 4 and 6, and it seemed to me that you were indicating that your reading is that the BIA had a narrower basis for its ruling. It's one of two things. If the board intended to affirm those two findings, that the police following him around in Kenya was implausible and that his arrest was implausible without being tried for a crime, those are inconsistent with the record. We cited the record in our brief. If the board intended to affirm those, there's not a basis in the record. If the board didn't, then that's my position, is that the board has only left this one line. Let's take the board at its word. The record thus supports the immigration judge's finding that the respondent testified inconsistently about his sexual orientation, IJ 4 and 6. At Page IJ 4 and 6, Royston is mentioned specifically. That's true. Yeah. So if you read the entire Pages 4 and 6, then the board had intended to incorporate everything the immigration judge had said, then, yes, you'll see the footnote in my brief where I said, I don't think the Royston letter is affirmed by the board, but it's certainly an issue because the Henry Great House letter was admitted but was not weighed, and yet the Royston letter, you know, it's the same situation. The last issue I'd like to get to is the application of ACFR 1240.10, this requirement that when attorneys withdraw or when a person appears pro se, that the immigration judge must tell them about the right to pro bono counsel, give them a copy of the list, and make sure that they have it. When we made this argument at the board, the board said, look at the notice to appear. Back when he was in L.A., he got a copy of the list. The problem with the board's analysis is that it's a different list. Lancaster has a different set of attorneys, and this court has said when an immigration judge does not follow ACFR 1240.10, it's an error. And the best way I can show prejudice is that the immigration judge continued to rely on representations made by Mr. Carandra's prior counsel after she admitted she had been doing a bad job and for that reason had been permitted to withdraw because of migraines or whatnot. And the Henry Great House letter actually supports that. It says, I was willing to come testify. Counsel didn't contact me. And so we would ask the court to find this violation of ACFR 1240.10 was a serious problem and that it made it harder for Mr. Carandra to present his case. I think the record would be different if he had been represented by counsel at court. We would ask the court to grant the petition for review. Thank you. But he was recommended, he was represented by counsel at one stage, was he not? He was. At the bond hearing, he was represented by an attorney who said she was only there to do bond, yet the immigration judge had her plead. At the second hearing, he was represented by an attorney who later came to court unprepared and said, I'm not ready to proceed. I have these migraines and I'm withdrawing as counsel. She actually had a history of being disbarred or six months suspension by the California for misrepresenting facts to a court. And so what we would ask the court to find is, yes, Immigration Lawrence told him, go call this one Catholic charities organization and see if they'll represent you. He came back to court and said, they wouldn't help me. But he wasn't given the list of 27 attorneys in Lancaster that have volunteered to be on the list of pro bono attorneys. Had he been, he may have been able to find counsel for the final hearing. Thank you. Good morning. May it please the Court. My name is Jacob Vesterhoff and I'm here on behalf of the Attorney General of the United States. I would like first to address Petitioner's argument regarding the immigration judge's finding that the relationship with heterosexual relations in the United States is not necessarily in the mind. He explained that he was a homosexual. This court in Shrestha pointed out that credibility determinations under the Reality Act must, therefore, be reasonable and take into consideration the individual circumstances of the act. While we do not dispute that the situation might be different in Kenya, but in the United States, when he came to this country, the record as to his homosexual relationship is sketchy. He claimed that he had some sort of relationship with Anthony Lowell and that relationship lasted for six months. But if we look in the record to see what that relationship entailed, he stated that we went to sex clubs and stuff like that. And there is no evidence with respect to what, if anything, they did that would constitute a homosexual relationship. The second relationship, I assume it was a virtual relationship, when he found James Vinson, a person he found online, and he had e-mails from that individual. Similarly, the reason why the board assigned limited weight to the letter is because Mr. Greathouse was not previewed to, at least the letter suggests, was not previewed to Petitioner's criminal record and he has heterosexual relationships. Looming large, the question, why would he need to maintain that facade with Mr. Royston and at the same time have a heterosexual relationship while he was romantically involved with Ms. Royston and father a child with another woman? Those are very hard questions for a petitioner to answer. And the court, as I pointed out, in light of Shred's decision and interpretation of the Reality Act, has to look in the context of what happened in the United States. The second question I would like to address is with respect of his father's and his father's knowledge about his homosexuality, something that bared in Petitioner's ability to obtain corroborating evidence from Kenya. He stated that he was not able to obtain corroborating evidence, which in his case was required because the action found that he was not credible. And he said that his father was frailing, he had some health issues, et cetera, et cetera, and then that he didn't, and his brother was not willing to assist him. However, we have here an individual whose father suspected and knew that he was a homosexual. If you look at the administrative record, pages 214 and 215, he testified that his father picked him up after the last incident in June of 2001, and he took him to a doctor. So there was definitely evidence that his father knew about that. And then he had... Picked him up where? I beg your pardon? Picked him up where? What would picking up his son prove? For medical attention. So the fact is that his son claimed that he was sodomized while he was in custody, and the fact that his son needed medical attention suggests that at least we can, I guess, draw an inference that there was some sort of knowledge on father's behalf that his son was somehow was a homosexual. And he also... He was sodomized by the police? His father didn't believe and he knew and he was, I guess, he didn't know how to explain as to... Didn't he claim that he was raped by the police? That's correct, he did. How does that show that he was homosexual? Well, his father suspected that he was homosexual because later on in the record, he testified that his father was embarrassed. He stated that his father, and he asked, and his father told him to stop shenanigans. So that might lead to, well, I guess, a reasonable fact-finding based on the facts, on the same set of facts they can disagree as to what a testimony can mean. So in this situation, the agency believed that the fact is that his father in Kenya somehow might have suspected and knew about that, about his homosexuality. As I said, you know... Might have suspected is substantial evidence upon which to base an adverse credibility finding? Well, the burn actually was in addition to producing compelling, the evidence compelling that the fact finder's determination was not... All right, never mind. Another point I would like to make is that with respect of pro bono counsel and at least that was provided with the NTA, the arguments that petitioner made with respect of Lancaster, at least that somehow Lancaster's list of attorneys is different than the one provided in Los Angeles, that issue was not exhausted before the board. The second one is the allegation that somehow his attorney was, Ms. Washington was incompetent. He didn't raise an effective assistant counsel claim before the board. Another point I would like to make is that he was advised about availability of pro bono counsel. He also was advised about Esperanza Catholic Services specifically visited the barracks. And that's something that indicated that, you know, petitioner at least was aware that there were pro bono counsel. And another thing is that he obtained services of Ms. Alvarez, who was with ALA pro bono counsel project. So to sum up, I would like to point out that nothing in the record suggests that petitioner did not know that there were pro bono counsel. He did not raise that. He did not complain to the argument that I don't have the list. He was also given continuances to obtain pro bono counsel. And in fact, during his last hearing, he could have requested a continuance. Nothing suggests that he wanted to do that. The court has no further questions. I'll let the arguments. Thank you. No questions. All right. We'll give you a minute for rebuttal. Counsel, didn't your client say at the last hearing that he was willing to go forward without an attorney at that point? He did, but he had said at the prior hearing he didn't think he'd be able to obtain an attorney.  This argument that the Lancaster versus L.A. issue wasn't exhausted is a red herring because the board is the one, when we raised this issue with the board, that said, well, look at the notice to appear. He got the list of the notice to appear. We're responding to what the board said. It's not something the immigration judge said that the board didn't have a chance to respond to. And if the Department of Justice wanted the court to think that these lists are the same, they could show them to you. The lists are not the same. They've got different attorneys on them. It's the Attorney General's regulation that says immigration judges are required to give out this list. And yet the Attorney General comes to this court and says there's no such requirement because a different agency, the Department of Homeland Security, gave this gentleman a different list by proxy and thus satisfied 8 CFR 1240.10. We would ask the court to apply the regulation as it's written that he has to be given a copy of the list. The list also changes every few months. And so the fact that he got the list back when he was placed into proceedings in Los Angeles doesn't mean he still had the list of attorneys on the list in Lancaster, California. With that, I would thank you for the opportunity to argue before this honor. Thank you. Thank you very much. The case of Caranga v. Holder will be submitted.
judges: O'scannlain, Bea, Christen